SEALED

UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

**MAY 0 1 2012**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )    Case No.
                                                  )
8507 CENTRAL AVENUE                               )    **2:12 - SW   2 1 4   KJN**
ORANGEVALE, CALIFORNIA 93662                      )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A, ATTACHED HERETO AND INCORPORATED BY REFERENCE

located in the ____EASTERN____ District of ____CALIFORNIA____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B, ATTACHED HERETO AND INCORPORATED BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a) | Activities relating to material involving the sexual exploitation of children; Activities |
| 18 U.S.C. § 2252A | relating to material constituting or containing child pornography; |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

PHILLIP L. HIRSCH, SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __May 1, 2012__

_____
*Judge's signature*

City and state: SACRAMENTO, CALIFORNIA

KENDALL J. NEWMAN, U.S. MAGISTRATE JUDGE
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR A SEARCH WARRANT

I, Phillip Hirsch, being duly sworn on oath, depose and say:

1. I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI, formerly known as Immigration and Customs Enforcement), presently assigned to the Office of the Assistant Special Agent in Charge (ASAC), Sacramento, California. In 1995, I received training as a Houston Police Officer at the Houston Police Academy in Houston, Texas. I was employed as a Houston Police Officer for seven years. In 2005, I received training as a Postal Inspector at the United States Postal Inspection Service (USPIS) in Potomac, Maryland, where I completed the Postal Inspector Basic Inspector Training (BIT). I was employed with USPIS for seven years. In 2010, I received training as a Special Agent at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I completed the Criminal Investigation Training Program (CITP), and the Immigration & Customs Enforcement Special Agent Training (ICE-SAT). I have been employed as a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI) for two years. I am currently assigned to the Lead Group that investigates individuals associated with seizures of narcotics, counterfeit Intellectual Property Rights (IPR) merchandise, counterfeit monetary instruments, and persons utilizing peer to peer software to obtain and/or make available for distribution images of child pornography, in violation of 18 U.S.C §§ 2251 and 2252. My duties as a Special Agent include the development and evaluation of information in order to detect violations of federal law. I have received training in the area of child pornography and child exploitation, and as part of my duties have observed and reviewed examples of child pornography and visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I

1

have applied for and received anticipatory search warrants, and I have been the affiant on search warrants within the Eastern District of California. I have participated in numerous child exploitation search warrants involving the use of computers and Internet, and have assisted in the gathering of evidence during execution of those warrants. I have also assisted with the interviews of individuals suspected of receiving and/or distributing child pornography. I am authorized to investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A.

## INTRODUCTION

2. The affiant submits this application and affidavit in support of a search warrant authorizing the search of 8507 Central Avenue, Orangevale, California, 93662 (hereinafter "SUBJECT PREMISES"). The SUBJECT PREMISES is located in the Eastern District of California, as further described in Attachment A. The affiant believes that located within the SUBJECT PREMISES there exist evidence, fruits, and instrumentalities relating to the knowing possession, receipt, distribution, and transportation of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A. The affiant requests authority to search the entire SUBJECT PREMISES, to include all rooms, attics, basements, containers, and all other parts therein, and surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the SUBJECT PREMISES, and any computer and computer media located therein, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the crime. In addition, I am aware that it is common practice for persons involved in the trafficking of child pornography to hide and transport child pornographic materials and/or their instrumentalities in vehicles. I request that the search warrant authorize the search of

2

vehicles located at or near the SUBJECT PREMISES which fall under the dominion and control of the person or persons associated with the SUBJECT PREMISES. The search of these vehicles is to include all internal and external compartments and all containers that may be associated with the storage of child pornographic materials or their instrumentalities contained within the aforementioned vehicles.

3. The statements in this affidavit are based in part on information provided by other law enforcement agents, as well as my own investigation of this matter. Since this affidavit is being submitted for the limited purpose of demonstrating probable cause for a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 18 U.S.C. §§ 2252 and 2252A are presently located at the SUBJECT PREMISES. Furthermore, there have been no other attempts that I am aware of to obtain the fruits, evidence and instrumentalities sought in this warrant directly from the SUBJECT PREMISES.

## STATUTORY AUTHORITY

4. This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors.

   a. 18 U.S.C. § 2252(a)(1) prohibits knowingly transporting or shipping, using any means or facility of interstate or foreign commerce, or in or affecting interstate commerce, by any means including by computer or mail, any visual depiction of a minor engaging in sexually explicit conduct.

   b. 18 U.S.C. § 2252(a)(2) prohibits knowingly receiving or distributing, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed, or has been shipped or transported in or affecting interstate or foreign

3

commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, provided the visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.  18 U.S.C. § 2252(a)(4) prohibits knowingly possessing or knowingly accessing with intent to view, one or more books, magazines, periodicals, films, video tapes or other matter which contain any visual depiction that has been mailed or shipping or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer, in interstate or foreign commerce, or that were produced using materials that had traveled in interstate or foreign commerce, if the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct.

## Overview of Peer to Peer Child Pornography Investigations

5.  The present investigation was initiated as a result of ongoing efforts by the ASAC Sacramento HSI office to proactively combat the escalating prevalence of the distribution of child pornography via Peer to Peer (P2P) file-sharing software. P2P application software allows networked computer users, connected to the Internet, to share many types of files with other users. These files typically include music, graphics, images, movies, and text. In this way, users are able to collect large numbers of files, including child pornography. Presently, millions of persons throughout the world use P2P file-sharing networks to share files with each other.

4

6. One of the most prevalent P2P file-sharing networks in use today is the "EDonkey" network. EDonkey is a system that allows individuals to use their computers to exchange files directly over the Internet without having to go through or access a specific Web site in an arrangement that can be described as computer to computer (or person to person, hence the name "Peer to Peer.") Unlike a traditional web site, EDonkey enables persons to obtain files directly from one another as long as they are connected to the Internet. Furthermore, EDonkey enables an individual to view the files made available to share with other EDonkey users. Upon installation and enabling of EDonkey on a computer, the computer then becomes both a client and a server in the network, and is able to share with other EDonkey users desired files that have been placed in a "share folder." The EDonkey network is presently utilized by numerous P2P file-sharing programs, including, but not limited to "EDonkey2000," and "eMule." These programs have software installed on them that facilitates the trading of images and other files. The software, when installed, allows the user to search for pictures, movies, and other digital files by entering text as search terms. For example, an individual looking for music files by a specific artist may enter a search term such as "Metallica," and will receive nearly instantaneously a list of other EDonkey users that have music titles pertaining to the rock band Metallica on their hard drives that are available to others on the network.

7. For the purposes of this investigation, it is important to note the following regarding the EDonkey network:

   a. EDonkey is an open-source, public file-sharing network. Most computers that are part of this network are referred to as "peers" or "hosts." A peer can simultaneously provide files to peers while downloading files from other peers. Peers may be elevated to temporary indexing servers referred to as an "ultra-peer." Ultra-peers increase the efficiency of the EDonkey network by maintaining an index of the

5

contents of network peers. EDonkey users query ultra-peers for files and are directed to one or more peers sharing that file. There are many ultra-peers on the network. If one shuts down, the network continues to operate.

b.    The EDonkey network can be accessed by computers running many different client programs. These programs share common protocols for network access and file-sharing. The user interface, features, and configuration may vary between clients and versions of the same client.

c.    During the default installation of an EDonkey client, settings are established which configure the host computer to share files. Depending upon the EDonkey client used, a user may have the ability to reconfigure some of those settings.

d.    Message-Digest Algorithm (MD4) is a cryptographic hash function developed by Ronald Rivest in 1990. It is a 128-bit algorithm.

e.    A file processed by this MD4 operation results in the creation of an associated hash value often referred to as a digital signature. MD4 signatures provide a certainty exceeding 99.99 percent that two or more files with the same MD4 signature are identical copies of the same file regardless of their file names.

f.    The EDonkey network uses MD4 values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple peers and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses MD4 values to ensure exact copies of the same file are used during this process.

g.    Upon connecting to the EDonkey network, the EDonkey client compiles a list of the shared files, files' details, and the files' associated MD4 values, and submits the list to the ultra-peers. This information is then propagated to other ultra-peers throughout the network. The frequency of updating information as file changes occur or candidates leave the network is dependent upon the client software being used and

6

EDonkey networking protocols. The information sent to the ultra-peers is data about the file and not the actual file. The file remains on the peer computer. In this capacity, the ultra-peer acts as a pointer to the files located on each peer. The network may be referred to as decentralized due in part to the fact that files do not reside on a single server but are located on individual peers throughout the network.

h. The EDonkey software allows the user to enter descriptive text as search terms. Entering search terms into an EDonkey client returns a list of files and descriptive information including, in some client software, the associated MD4 signature. Based on training and investigative experience, it is known that when one enters search terms synonymous with child pornography, such as "pedo," "kiddie," "pthc," and other terms, an individual will receive a list of files that overwhelmingly contain child pornography, and more importantly for the purposes of this investigation, a list of other users on the network, who have made those files available for distribution. Your Affiant knows that it is possible to compare the MD4 signatures of files being shared on the network to previously identified MD4 signatures of any file, including child pornography. Using a publicly available EDonkey client, a user can select the MD4 signature of a known file and attempt to receive it.

i. Once a specific file is identified, the download process can be initiated. Once initiated, a user is presented with a list of peers or IP addresses that have recently been identified as download candidates for that file. This allows for the detection and investigation of computers involved in possessing, receiving and/or distributing files of previously identified child pornography.

j. Your Affiant knows that the IP addresses can be used to identify the location of these computers. A review of the MD4 signatures allows an investigator to identify the files that are child pornography.

k. The returned list of IP addresses can include computers that are likely to be within this jurisdiction. The ability to identify the approximate location of these IP

7

addresses is provided by IP geographic mapping services, which are publicly
available and also used for marketing and fraud detection. At this point in the
investigative process, a recent association between a known file (based upon MD4
comparison) and a computer having a specific IP address (likely to be located within
a specific region) can be established.

l.  Once this association has been established, an investigator can attempt to download
the file from the associated peer or view the contents of the shared directory.
Depending upon several factors including configuration and available resources, it
might not be possible to do either.

m.  Depending on the associated peer configuration and available peer resources a listing
of the files being shared may be displayed. In order to obtain this list of files, a
direct connection between the computers must occur. This list can be a partial
listing of the shared files. The file list can only be obtained if the associated peer is
connected to the network and running an EDonkey client at that moment.

n.  By receiving either a file list or portions of a download from a specific IP address,
the investigator can conclude that a computer, likely to be in this jurisdiction, is
running an EDonkey client and possessing, receiving and/or distributing specific and
known visual depictions of child pornography.

o.  Your Affiant knows the P2P software may display the Globally Unique Identifier
(GUID) identification number of computers offering to share files on the network. A
GUID is a pseudo-random number used in software applications. This GUID
number is produced when some P2P software applications are installed on the
computer. While each generated GUID is not guaranteed to be unique, the total
number of unique keys is so large that the probability of the same number being
generated twice is very small. When comparing these GUIDs, your Affiant can
quickly determine with a high degree of certainty that two different IP addresses that
are associated with the same GUID are associated with the same computer.

8

8. This investigation of P2P file-sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children (ICAC) Task Force Program. Many of the officers/agents involved in this effort are using the technology and methods described herein. This methodology has led to the issuance and execution of search warrants around the country resulting in many seizures of child pornography and arrests for possession and distribution.

9. It should further be noted that the methods utilized during this investigation merely capitalize upon the fact that a suspect's IP address has been broadcast by a suspect's own computer onto the network as a function of the network software. Because the investigative method utilized by agents and described herein does not provide any additional identifying data other than a user's IP address, it is incumbent upon investigating officers/agents to take additional steps to identify the specific location of the computer that is being utilized to distribute child pornography. It should further be noted that the ability to view the file names and MD4 values a suspect has on his computer is a direct function of the P2P file-sharing software that the suspect has freely and independently utilized in furtherance of his file-sharing activities, and is not a function of any software designed by or proprietarily utilized by law enforcement. Simply stated, by definition the suspect himself has in effect advertised publicly, via the Internet, which files he has on his hard drive by making those files available to EDonkey network users. Law enforcement agents/officers have simply availed themselves of this information that the user/suspect has made publicly available on the network.

## Facts Establishing Probable Cause

10. In furtherance of the investigation, on or about January 25, 2012, ASAC Sacramento HSI Special Agent (SA) Nicole Solander accessed the P2P EDonkey network for the

9

purposes of locating computers currently sharing, or that had recently shared, images of child pornography. As a result, your Affiant was provided by SA Solander the IP address of **67.161.177.126**, which originated within the Eastern District of California. Upon locating this IP address, investigators were then able to receive a publicly-available listing of approximately one-hundred fifty (150) files that were known, through a match of MD4 values, to contain child pornography, and which were available for distribution by the individual connecting to the EDonkey network through the aforementioned IP address. A review of the information presented to investigators indicated that the files were made available on the P2P network from January 7, 2012, at 0643 hours GMT, though at least January 29, 2012, at 0704 hours GMT. At all of the above times, the available files were continuously associated with IP Address **67.161.177.126**. Additionally, on or about January 26, 2012, HSI SA Solander accessed the P2P EDonkey network and made a direct connection to IP address **67.161.177.126,** from which she downloaded seven complete video files.

11. The titles of the seven video files downloaded from IP Address **67.161.177.126** are:

    a. 2010 HMM - new 04yo model blowjob on chair.MPG

    b. 2011 [MB] Abused little boy in bed.wmv

    c. preteen girl orgasm 2 webcam (new 2011).avi

    d. pthc Annare 5yo sleeping dad how her pussy.mpg

    e. Webcam - Daredvl_NEW (9yo_ full nude_ mast).avi

    f. (Lolita)!PTHC - Veronicas Sister Fucking NEW VID.avi

    g. (PTHC) 9Yo Niece - Backfuck.mpg

12. Your affiant examined the MD4 values associated with all seven files in paragraph 11 above and confirmed that the MD4 values matched files previously identified by law enforcement, and subsequently added into a law enforcement database, as known

examples of child pornography. The MD4 values for the image files listed in paragraph 11 are, in order, as follows:

a. 96A451214AD1962358DD48F65489B202

b. 52D7F8E1B0FF1F64E06F8D78E2CE376B

c. D5A59D6D6C521E369784F9ABCB4C3D35

d. FA8C4375A1982E728CFCC5E90E0B8DB5

e. 3944CBF26DEEE67EFB57AB44810DCE65

f. 018F2D41EDEAE13E69D0A912203A8BF5

g. 0A0D00225EC29CD7DC71DCC064E648AF

13. Pursuant to this investigation, on April 25, 2012, your Affiant examined a copy of the file listed as file (a) in paragraph 11 above. That file is identified by the MD4 value of 96A451214AD1962358DD48F65489B202 and the SHA1 Base32 value of QYHF6HVZUNPCFFMMIY5NTBJO2G5NZEIB. This video is approximately 29 seconds in length. The video begins with a young girl, approximately 8-10 years of age in appearance, exposing her naked buttocks and vaginal area. The adult male places his hands on the buttocks and appears to be massaging her naked buttocks. The young girl places her hands on her naked buttocks and appears to spread her buttocks. The adult male is masturbating and at one point, the adult male inserts his penis inside the young girl's vagina on multiple occasions. The adult male continues to masturbate, while the young girl continues to hold and spread her buttocks. Based on your Affiant's training and investigative experience, this video constitutes child pornography as defined by Title 18 U.S.C. 2256 and was received by, possessed, and made available for distribution, by the individual utilizing IP Address 67.161.177.126 from at least January 7, 2012, at 0643 hours GMT, through at least January 29, 2012, at least 0704 hours GMT.

11

14. Pursuant to this investigation, on April 25, 2012, your Affiant examined a copy of the file listed as file (g) in paragraph 11 above. That file is identified by the MD4 value of 0A0D00225EC29CD7DC71DCC064E648AF and with the SHA1 Base32 value of MQ7BOPYVGFLLRSATBRI7GR46O5CHJV4K. This video is approximately 44 seconds in length. The video begins with a young pre-pubescent nude female, approximately 4-6 years of age in appearance sitting on a chair with an adult male standing next to her on the chair. The video displays the following video caption text, "H.M.M, TORCHAT, kx4doyghdpm36yk5, victor.mokba@mail.ru." The nude minor female holds the adult male's penis and performs oral sex on him. At one point, the adult male places his hand on the minor. The minor then returns to the adult male and performs oral sex on him again, as the minor places her hands on the legs of the adult male. The video ends with the same following video caption text, "H.M.M, TORCHAT, kx4doyghdpm36yk5, victor.mokba@mail.ru." Based on your Affiant's training and investigative experience, this video constitutes child pornography as defined by Title 18 U.S.C. 2256 and was received by, possessed, and made available for distribution, by the individual utilizing IP Address 67.161.177.126 from at least January 7, 2012, at 0643 hours GMT, through at least January 29, 2012, at least 0704 hours GMT.

15. Your Affiant can also conclude from training and experience that the investigation thus far indicated that a computer connected to the P2P EDonkey network via IP Address **67.161.177.126** possessed and/or distributed child pornography during the period from January 7, 2012, at 0643 hours GMT, through January 29, 2012, at 0704 hours GMT.

16. Further investigation revealed that the IP Address **67.161.177.126** is owned by Comcast Cable Communications (hereinafter "Comcast"), and that the numbers contained therein indicate that the user was located in the Sacramento, California area. Your affiant issued

12

a DHS Summons to Comcast requesting subscriber information associated with the IP address **67.161.177.126** that was utilized between January 7, 2012, at 0643 hours GMT, through January 29, 2012, at least 0704 hours GMT, which encompasses the dates and times that the IP address referenced above is known to have made the files mentioned above available for distribution over the P2P network.

17. On or about February 6, 2012, Comcast responded to the aforementioned DHS summons. According to Comcast, the IP address referenced above was assigned to customer PAUL BAILEY at 8507 Central Avenue, Orangevale, California, 95662 (the SUBJECT PREMISES), account number 8155600391823849, telephone number 916-987-5694 and was so at the times specified in paragraph 18 above.

18. Further investigation confirms that Comcast subscriber Paul BAILEY does, in fact, reside at the SUBJECT PREMISES. On or about February 7, 2012, your affiant conducted database queries and identified Paul BAILEY's California drivers' license number R0253109. California Department of Motor Vehicles ("CA DMV") records indicate that Paul BAILEY resides at the SUBJECT PREMISES. Record checks into CA DMV indicate that a 1989 Chevrolet with license plate number 6F78671 is currently registered to Paul BAILEY at the SUBJECT PREMISES. On the same date, your affiant received customer information from the Sacramento Municipal Utility District (SMUD), indicating that Paul BAILEY was the person on file responsible for utilities at the SUBJECT PREMISES.

# CHARACTERISTICS COMMON TO PERSONS WHO DOWNLOAD AND POSSESS CHILD PORNOGRAPHY

19. Based upon my training and experience, I am aware that the following characteristics are generally found in varying combinations in people who receive, possess, distribute, or transport child pornography:

a. These people view children as sexual objects.

b. These people collect sexually explicit and other erotic images of minors which they use for their own sexual gratification and fantasy.

c. These people rarely, if ever, dispose of sexually explicit images of minors because the images are treated as prized possessions. They store such images in different formats including photos, printouts, magazines, videotapes, and forms of digital media such as hard drives, diskettes, and CD-ROMs. They store such images in different places including their home, their car, and other areas under their control.

d. These people may use sexually explicit images of minors as a means of reliving fantasies or actual sexual encounters. They also use the images as keepsakes and as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading, or selling the images to other people with similar interests.

e. These people go to great lengths to conceal and protect from discovery their collection of sexually explicit images of minors. They may have passwords, to access programs or to control encryption, which are written down and located in the vicinity of their computer, or located on their person. They may place child pornographic files in directories or folders on their computer or other digital storage media, not typically reserved for image or video files. They may use encryption software to protect their child pornographic files. They may change file names of sexually explicit images in an attempt to hide such images from a forensic review. They may change the extension on such image files in an effort to disguise them as a word processing file. They may also transfer such files downloaded from the

14

internet to removal storage media including but not limited to computer disks, thumb-drives, digital cameras, smart cards, and cellular phones, and then attempt to erase the files from computer hard drives, in an effort to hide evidence of their download activity.

f. If one of these collectors is someone who has had sexual contact with a minor, it is likely such person has visual depictions of minors with whom they have had sexual contact. If a picture of a minor is taken by such a person depicting the minor in the nude, there is a high probability the minor was used to produce sexually explicit images to be traded with people with similar interests. If pornographic depictions of a minor were produced as mentioned above, an analysis of the cameras, scanners, or webcams in the possession of the subject may yield clues as to what device was used in the commission of such crime. Such analysis would require the removal of the device to a laboratory setting.

g. If child pornography is found on the hard drive of a collector's computer, and his computer was connected to the Internet, there is a strong likelihood that the person received the images of child pornography from the Internet, either from internet websites devoted to child pornography, or from other individuals who sent the images directly via email.

h. Child pornography collectors who acquire sexually explicit images of minors from the Internet, will typically bookmark the locations (i.e. websites, news groups and other locations) on the Internet from which they accessed child pornographic images. By bookmarking such locations, these collectors can readily gain access to such sites.

i. Child pornography collectors also tend to collect child erotica because it is more readily available, partially satisfies their sexual fantasies, and is often intermixed with child pornography on the Internet.

15

j. Child pornography collectors often will collect graphic sexual stories relating to the sexual abuse of children, as they too are used to satisfy their sexual fantasies.

## TOOLS OF THE INTERNET

20. I know from my training and experience that individuals who receive, possess, distribute, and transport child pornography often use the Internet to increase the number of images in their collection. The Internet provides users with access to websites and social networking sites from which images of child pornography can be downloaded and uploaded. In addition, the Internet allows communications with others who express an interest in child pornography and permits the transfer of data and images across state and foreign boundaries. Individuals who use the Internet can communicate electronically by using e-mail. E-mail messages can contain text, data, or graphic images. This type of communication is private in that it is directed from one Internet user to another. Internet users can also communicate and trade images of child pornography using Instant Messaging. Instant Messaging is "real time" communication in that the persons communicating are engaging in online dialog. This means of communication, like e-mail, is private in that it is one Internet user communicating specifically, and exclusively, with another.

21. Digital evidence of the results of web browsing can often be found on the hard drive of a computer during a forensic examination. In addition, the dialog and image downloads created when corresponding via email and instant message are generally stored in the hard drive of a computer until overwritten by other correspondence, and are often retrievable during a forensic examination of the computer. This is true, even if the computer user has deleted the data.

## DEFINITIONS

16

22. For purposes of this warrant, relevant specialized and technical terms are defined as follows:

   a. The term "minor," "sexually explicit conduct," "visual depiction," "producing," "child pornography," and "child erotica" as used herein, are defined as set forth below:

      i. Minor is defined as any person under the age of eighteen years. 18 U.S.C. § 2256(1).

      ii. Sexually explicit conduct means actual or simulated - (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2).

      iii. Visual depiction includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image. 18 U.S.C. § 2256(5).

      iv. Producing means producing, directing, manufacturing, issuing, publishing, or advertising. 18 U.S.C. § 2256(3).

      v. Child pornography means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where – (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct[.] 18 U.S.C. § 2256(8).

      vi. Child erotica are images depicting minors in the nude or scantily clad in age-inappropriate clothing, striking sexually provocative poses intended to illicit a

sexual response. The images may not meet the definition of sexually explicit conduct, but are often found in child pornography collections.

b. The term "computer" is defined under 18 U.S.C.§ 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such device."

c. Computer hardware consists of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data processing devices (such as central processing units, self-contained laptop and notebook computers, hand-held electronic organizers, personal digital assistants, and WebTV units), removable media, internal and external storage devices (magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices), and related communication devices such as modems, cables, connectors, programmable telephone dialing or signaling devices, and electronic tone-generating devices, and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as physical keys and locations.

d. A system peripheral is a piece of equipment that sends data to, or receives data from, a computer. Keyboards, mouses, cameras, webcams, video cameras, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

e. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs

18

to run operating systems, applications (like word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

f. Computer-related documentation consists of written recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

g. Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (string of alphanumeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, cards, and circuit boards. Data security software or digital code may include a programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h. Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVDs, magnetic tapes, ZIP disks, JAZ disks, thumb drives, and EPROMS.

i. The Internet is defined as a non-commercial, worldwide network of computers. It is a self-governing network devoted mostly to communication and research and has millions of users worldwide. The Internet is not an online service but a collection of tens of thousands of computer networks, online services, and single user components.

j.  Internet Protocol (IP) is the primary protocol upon which the Internet is based. It allows information to travel through multiple networks on the way to its final destination.

k.  An IP address is a unique number assigned to every computer directly connected to the Internet (for example 190.25.240.1). The IP address consists of four parts, is unique to each machine, and can be used to identify a particular machine on the network, at a particular time and date.

l.  An Internet Service Provider (ISP) is a business that allows a user to connect to the Internet through its computers for a fee. Internet Service Providers usually provide an Internet connection, an electronic mail (e-mail) address, and sometimes Internet browsing software. A user also may connect to the Internet through a commercial online service such as CompuServe or America Online (AOL). With this service, users may also have access to other features such as chat rooms and searchable databases.

m.  "Domain Name" refers to the common, easy to remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

20

n. "Log Files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

o. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

p. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

q. A "JPEG" is a graphic image file. Other known graphic image files include, but are not limited to, "GIF," "TIFF," "RAW," and "BMP."

r. An "MPEG" is a video image file. MPEG files are generally larger than JPEG files and require the user to have a computer with sufficient processor speed, internal memory, and empty hard disk space. MPEG viewer software is also needed to play the files.

s. The Uniform Resource Locator (URL) is the address of a resource or file located on the Internet, also called a "domain name."

t. A chat room is a site on the internet where a number of users can communicate in real time. A chat room is typically dedicated to a particular topic. Users type their messages with a keyboard and the entered text will appear on the monitor, along with the text of the other chat room visitors. Individuals in a chat room have the

ability to invite other users within the chat room to private communication sessions which are thereafter strictly between the two users.

u. A webcam is a video capture device connected to a computer or computer network. The video captured by the device is broadcast over the internet to be viewed by other internet users in real time. The term "Webcam" can also be used to describe a file transfer between two individuals on the internet. An individual playing a video file saved to their own computer can broadcast the video to another user's computer screen through an internet connection.

v. Screen capture software is a software application that copies what is currently displayed on a user's computer screen to an electronic file or printer. The electronic file can then be viewed as a video. This video depicts everything that was displayed on the original user's computer screen. This software can record real time chat sessions, key strokes, mouse movement, video and audio displayed on the user's screen.

w. In addition, as used in this affidavit, "records," "documents," and "materials" include items in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, electrical, electronic, and magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and data security devices.

## SEARCH AND SEIZURE OF COMPUTERS AND RELATED STORAGE MATERIALS IN GENERAL

23. Based on my own experience and conversations with other agents, I know that information stored in an electronic format may be found not only on the hard disk drive of a computer, but also on other computer hardware, peripherals, and storage media. In addition, to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware, peripherals, and other storage media, to be

22

searched later by a review team in a controlled environment. This is true for the following reasons:

a. <u>Volume of Evidence</u>: Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires the review team to examine all the stored data to determine whether it is included in the warrant. This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

b. <u>Technical Requirements</u>: Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c. In order to retrieve electronically stored evidence from a computer, agents may be required to seize most or all of a computer system's equipment, including hardware, peripherals, software, documentation, security devices, and passwords. This is true because of the following:

  i. Certain operating systems and hardware can be configured to operate only with a precise set of hardware, software, and peripherals.

  ii. Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their compatibility with other hardware and software.

  iii. The review team may have to install software used by the suspect on a government computer in order to retrieve the information the suspect may have stored using that software. The review team may also need to refer to hardware

and software documentation maintained by the suspect to complete an analysis in a timely manner. The suspect's computer documentation may also contain hand-written notes specific to the seized computer system.

d. The Nature of Data Storage: Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user's practices. It often takes weeks or months to complete such a search, particularly if many hard drives and other storage media are seized from the location to be searched. A thorough search for such relevant evidence would be impractical during an on-site preview.

24

24. As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT ITEMS not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and who used them. Additionally, the warrant seeks information about the possible location of other evidence, or about persons who may know things helpful to the investigation at issue.

25. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found on the SUBJECT ITEMS, in whatever form they are found. One form in which the records might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the computer(s) or other electronic storage media seized.

26. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer hard drives can contain other forms of electronic evidence as well. In particular, records of how a computer has been used, the purposes for which it was used, and who has used it are called for by this warrant. As described above, data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the hard drive that show what tasks and processes on the computer were recently in use. Web browsers, e-mail programs, and chat programs

25

store configuration information on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals (e.g. cameras and printers for creating or producing images), the attachment of USB flash storage devices, and the times and dates the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be evidence of a crime, or can point toward the existence of evidence in other locations. Evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

27. In finding evidence of how a computer has been used, the purposes for which it was used, and who has used it, sometimes it is necessary to establish that a particular item is not present on a drive. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge. This software can allow a computer to be used by others. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present on the computer, and, if so, whether the presence of that malicious software might explain the presence of other things found on the computer's hard drive.

28. Upon searching the SUBJECT ITEMS, law enforcement personnel trained in searching and seizing computer data will seize the computer equipment and transport it to an appropriate law enforcement laboratory for review. The computer equipment and storage devices, any search of, electronic media, on or off site will be performed by a review team in accordance and as defined by the review protocols described below in

26

order to extract and seize any data that falls within the list of items to be seized as set forth in Attachment B.

29. In order to fully retrieve data from a computer system, the review team needs all electronic storage devices as well as the computer's central processing unit (CPU). As in this case where the evidence consists partly of graphic files, the monitor and printer are essential to show the nature and quality of the graphic images which the system could produce. In addition, the review team needs all the system software (operating systems or interfaces and hard drive drivers) and any application software which may have been used to create the data (whether stored on hard drives or on external media). Where there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem, hardware and software are all instrumentalities of the crime of receipt, possession, distribution, or transportation of child pornography in violation of federal law, they should also all be seized as such.

30. If the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items in a reasonable amount of time not to exceed 120 days from the date of seizure unless further authorization is obtained from the Court. Due to the review team protocols described below, the examination and evaluation of seized electronic devices is expected to take a considerable amount of time due to the limited forensic resources available. It is for this reason, this affiant respectfully requests the 120-day period of review.

31. No wire communications or electronic communications shall be intercepted during the execution of this search warrant. I have no information to indicate that the computer(s) to be searched operate in any way as a server of an electronic bulletin board service, Internet web site host, Internet file transfer protocol server, Internet chat server, or

27

Internet email forwarder or server. As such, it would appear that the provisions of the Wire and Electronic Communications Interception Act, 18 U.S.C. Section 2510 et seq., do not apply. Should information of this type be discovered, the Government will preserve it and set it aside.

## **SPECIFIC METHODS FOR SEARCH OF DIGITAL EVIDENCE**

32. Your affiant is seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. As many devices commonly found in a residence may contain digital data, your affiant will make every reasonable effort to minimize seizures to only those devices for which there is reason to believe might be found: 1) evidence or fruits of the aforementioned crimes; 2) contraband implicated by this affidavit; and 3) property/instrumentalities designed for use, intended for use, or used in the commission of the aforementioned crimes. If personnel trained in the forensic preview of digital evidence are available, and if doing so will not extend the duration of the search to an unreasonable time. Your affiant intends for there to be an on-scene preview of the digital evidence in order to minimize the amount of material which needs to be removed from the premises. Your affiant is aware that certain tools are available to trained personnel which make such previews possible under certain circumstances. Such a preview generally consists of reviewing images and videos contained on digital media, and searching for filenames which appear to contain references to child pornography. These previews are done in a manner which preserves the integrity of the data on the device. A forensic preview is not a substitute for a forensic examination, but in certain instances (such as when it is possible through interviews to determine which items belong to uninvolved third parties), an on-site forensic preview can be a useful tool in minimizing the number of digital devices that need to be removed from the premises for a full forensic examination. If an item which may reasonably contain evidence of child pornography cannot be eliminated from

28

suspicion, your affiant intends to remove it to a laboratory setting for a more detailed forensic examination by the review team, in accordance with the parameters described below.

33. As previously mentioned, the search of a computer hard drive or other computer storage medium is a time-consuming manual process often requiring months of work. Your affiant is aware that the seizure of a computer hard drive, by necessity, provides the seizing agency with potential access to data outside the scope of this warrant. A search protocol will be utilized to uncover evidence, instrumentalities and contraband set forth in Attachment B for which there is probable cause. As part of the search protocol, your affiant intends to direct the review team to search any computer and computer storage medium for those items contained in Attachment B. As it concerns this particular case, your affiant intends to direct the review team to search digital media with some or all of the following methods, not listed in any particular order; however, the listing of these methods is not a representation that these specific techniques will be employed in this case:

    a. <u>Keyword Searches</u>: Your affiant is aware that computer forensic utilities provide the capability for a user to search for specific key words which may exist on a piece of digital media. Your affiant intends to use specific keywords known to be related to either the subject's illicit internet activities or child pornography. As it concerns child pornography, examples of such keywords include, but are not limited to "preteen," "hussyfan," and "r@ygold." Those keyword searches will indicate files and other areas of the hard drive that need to be further reviewed to determine if those areas contain relevant data. A list of keywords utilized will be maintained with the records of the forensic examination.

    b. <u>Data Carving</u>: Your affiant is aware that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is,

the space not currently used by active files. Your affiant is further aware that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files which can be carved out, often in an automated or semi-automated fashion. Your affiant intends to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose your affiant to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

c. <u>Hash Value Comparisons</u>: Your affiant is aware that computer forensic utilities provide the capability to utilize a function known as a hash algorithm. A hash algorithm uses a mathematical formula to analyze the data composing a file, and to generate a unique "fingerprint" for that file. The act of hashing a piece of data does not reveal to an investigator any information about the contents of that data. However, your affiant is aware that computer forensic applications often contain databases of known hash values for files. Some of those files are "ignorable," which enables other forensic processes to ignore files (such as the Windows operating system) that are not evidentiary in nature. Some of the files are "alert" files, such as the Child Victim Identification Program (CVIP) hash set, that contains hash values for a small subset of the identified picture and video files for known victims of child pornography. CVIP alert files notify an examiner that a file appears to contain known depictions of child pornography. Your affiant seeks permission to utilize automated hash value comparisons to both exclude irrelevant files, and to locate known child pornography files. Hash value comparisons are useful, but not definitive, as even a single-bit change to a file will alter the hash value for the file. The forensic review team does not intend to rely solely on hash value comparisons,

but intends to utilize them in order to assist with identifying relevant evidence. The use of this search method is intended to narrow the search. A search of known hash values, however, will not be used exclusively, because your affiant knows that when previously identified images of child pornography are found on a target's computer, typically there are many more images of child pornography depicting unknown child victims. Using a hash value search method exclusively would not uncover these images of unknown child victims as well as other evidence authorized by this warrant and described in Attachment B.

d. Opening Container Files, Encrypted Volumes, Embedded Files: Your affiant is aware that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, your affiant intends to use sophisticated forensic tools to attempt to open any such container files which may reasonably contain evidence of child pornography.

e. File Header/Extension Checks: Your affiant is aware that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. Your affiant intends to run an automated header comparison to detect such efforts, and

31

intends to review any such files which reasonably may contain evidence of child pornography.

f. Thumbnail / Image Views: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. Your affiant therefore intends to examine at least a thumbnail image of each image file on the digital media whether "live," data carved, or identified by header.

g. Registry / Log File Checks: Your affiant is aware that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs which contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry." Such files contain specific information about users, often including email addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices which have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. Your affiant intends to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

h. Metadata / Alternative Data Streams: Your affiant is aware that many file types, operating systems, and file systems have mechanisms for storing information which is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file which is not usually associated with the content of a file, but is often associated with the properties of the application or device which created that file. For example, a digital camera photograph often has hidden data

32

which contains information identifying the camera which manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file which would not be immediately visible to an end user without some action taken. Your affiant is aware that both metadata and alternative data streams may contain information which may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. Your affiant intends to review any such data which is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

34. With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, your affiant is aware that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

35. Your affiant is aware that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original. Upon the completion of the search processes described above, which are performed on the image of the hard drive, the hash algorithm is again

33

run on the image copy to insure no alterations of the data occurred during the examination process.

36. As previously mentioned, in the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible, not to exceed 120 days.

37. Your affiant also requests judicial authorization to retain copies of all seized storage media after the review is complete. Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B).

38. That Judicial authorization is justified in this case in part because:

   a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts and the investigator may retain a copy of seized or electronically stored information pursuant to Fed. R. Crim. P. 41(f)(1)(B).

   b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

   c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Retention of a complete image

assures that it will be available to all parties, including those known now and those later identified. Specifically in this case, based on the nature of P2P file-sharing, forensic analysis may identify the user names and screen names of those distributing child pornography to the user of the target computer(s).

d.  The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through additional warrant if necessary, to investigate such a claim.

e.  Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

39. Your affiant has not attempted to acquire the sought after material through any other investigative or judicial process.

## **REVIEW PROTOCOL**

40.  Contextual evidence that establishes how computers were used, the purpose of their use, and who used them is a conclusion, based on a review of all available facts and the application of knowledge about how a computer behaves. Therefore, such evidence will be searched for and seized in order to understand the evidence described in Attachment B and is included within the scope of this warrant.

41.  Although it is not possible to accurately predict the exact composition of the review team, given the very limited computer forensic examination resources available at

35

present, it is possible that the team may include one or more agents (myself included), computer specialists, analysts, and/or attorneys including members of the investigative team. The team will not necessarily consist only of persons with those job descriptions, and by referencing those job descriptions, I do not intend to represent anything about the manner in which the team will conduct its review. It is also possible that the review "team" will consist of a single person.

## REQUEST FOR SEALING

42. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation run by HSI. In the past, unsealed search warrant affidavits filed in this district have been published in the media while the investigations were ongoing, making the potential destruction of evidence or flight of suspects more likely. As such, premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

43. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that computer equipment located at the location described in Attachment A is being used in the transportation, distribution, and/or possession of visual depictions of minors engaged in sexually explicit conduct. Your affiant respectfully submits that there is probable cause to believe that an individual residing in the residence described above has violated 18 U.S.C. §§ 2252 and 2252A and that evidence, fruits, and instrumentalities of the above-described offenses, as more

particularly described in Attachment B, are likely to be found at the SUBJECT PREMISES.

44. I swear, under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

PHILLIP HIRSCH
Special Agent
Homeland Security Investigations

Approved as to form.

MATTHEW MORRIS
Assistant United States Attorney

Subscribed and sworn to before me this _1_<sup>st</sup>
day of May, 2012

KENDALL J. NEWMAN
United States Magistrate Judge
Eastern District of California
Sacramento, California

37

**ATTACHMENT A**
PLACE TO BE SEARCHED

The residence at 8507 Central Avenue, Orangevale, CA 93662 is a single family dwelling. The numbers "8507," in black lettering on the residence's tan garage, are affixed to the aluminum siding on the corner of the residence. The residence is described as a single-story, tan in color residence with dark brown trim on the north side of Central Avenue. The front door is burgundy in color and is located on the side of the residence. There is a small front yard composed of grass, walkway, and bushes in front of the residence. There is a two car driveway located south of the garage. Also, there is a sidewalk located to the south of the driveway and front yard.




The following items, which may be evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252(a) and 2252A(a) and/or contraband are to be searched and/or seized:

1. Documents, communications, images or other materials directly or indirectly evidencing violations of Title 18, United States Code, Sections 2252(a) and 2252A(a), in any form wherever it may be stored or found including, but not limited to:

   a. Any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, cellular telephones, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any related hardware/software manuals;

   b. Any and all visual depictions of minors engaging in sexually explicit conduct, including originals, copies and negatives, in any format or media, including, but not limited to, motion picture films and video cassettes, books and magazines, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, or other visual depictions of such Graphic Interchange

39

format equipment which may be, or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with children or the production, distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography, child erotica and the data within the aforesaid objects relating to said materials. The term "minor", as used herein, as defined in Title 18, United States Code, Section 2256(1), means a person under the age of 18 years;

c. Envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages pertaining to the production, possession, receipt, distribution or offers to distribute, or advertisement of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail;

d. Envelopes, letters, and other correspondence, including, but not limited to, electronic mail, chat logs and electronic messages, identifying persons transmitting through interstate or foreign commerce, including by United States mail or by computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

e. Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the purchase and/or transmission through interstate or foreign commerce including by United States mail or by computer, of any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

f. Address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce including by United States

mail or by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; and

g. Address books, names, lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

2. All computer systems, computer programs or software and supporting documentation, journals, diaries or other memoranda, that is necessary to the use and operation of the system or is necessary to recover digital evidence from the system and any associated peripherals that are believed to contain some or all of the evidence described in the warrant.

3. Credit card information, specifically related to the purchase, installation, or maintenance of an Internet or e-mail account including but not limited to bills and payment records.

4. Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

5. Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

41

# SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*    )    Case No.  **2 1 2 - SW    2 1 4 ~~~~~ KJN ~~**
    )
8507 CENTRAL AVENUE    )
ORANGEVALE, CALIFORNIA 93662    )

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     **EASTERN**     District of     **CALIFORNIA**    
*(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A, ATTACHED HERETO AND INCORPORATED BY REFERENCE

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B, ATTACHED HERETO AND INCORPORATED BY REFERENCE

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     _May 15, 2012_
    *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge

_____.
    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
    ☐until, the facts justifying, the later specific date of _____.

Date and time issued:  _May 1, 2012  3:30 p.m._    _____
    *Judge's signature*

City and state:    __SACRAMENTO, CALIFORNIA__    __KENDALL J. NEWMAN, U.S. MAGISTRATE JUDGE__
    *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subscribed, sworn to, and returned before me this date.

_____ _____
*Signature of Judge*                    *Date*